(No. 22667.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MELVIN REEVES, Plaintiff in Error.

*Opinion filed February 15, 1935—Rehearing denied April 10, 1935.*

THOMAS J. JOHNSON, SR., and THOMAS J. JOHNSON, JR., for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The plaintiff in error (hereinafter called the defendant) was indicted at the May term, 1932, of the criminal court of Cook county. The indictment consists of two counts. The first count charges forcible breaking and entering the office of the H. W. Kastor & Sons Advertising Company, a corporation, (hereinafter called the company,) with intent to commit larceny of a certain amount of United States government postage stamps, the property of said company. The second count charges the defendant with entering the office of the company, the doors and windows being open, with intent to commit larceny

therein. The case was brought to trial on October 25, 1932, before one of the judges of the criminal court. The trial proceeded for several days and the court declared a mis-trial. The case was then tried before a jury in November, 1932, and the defendant found guilty of burglary as charged in the indictment. A new trial was granted. On May 24, 1934, the cause was stricken by the State's attorney, with leave to re-instate. On June 12, 1934, the defendant was surrendered by his sureties in open court and the cause was re-instated on the trial docket. On June 22, 1934, he was again placed on trial before a jury, and a verdict was returned finding him guilty of burglary as charged in the indictment and he was sentenced to the penitentiary. He has sued out this writ of error to review the judgment.

The principal errors assigned and argued are, (1) the evidence does not sustain a conviction for the crime of burglary; (2) the *corpus delicti* was not proved; (3) the defendant was not identified with that degree of certainty required by the rules of law; (4) the trial court erred in rulings upon the testimony; (5) the State's attorney made improper and prejudicial remarks; and (6) the court erred in instructing the jury.

The evidence on behalf of the People tends to establish the following: The company occupied the twelfth floor of the building in Chicago located at 360 North Michigan avenue, adjacent to Wacker drive. On Saturday, May 28, 1932, at the close of the business day, all the safes and the vault in the offices and the outside office doors were locked. The office was not opened for business on Decoration day. On May 31, on the opening of the office, it was discovered that the combination on the safe or vault in the president's office had been knocked off, the shaft of a screw-driver without the handle was found sticking into the mechanism, and the door was open. The combinations on two other safes in other rooms of the offices had been knocked off

and the doors opened. In the vault the company had a metal box in which was kept its supply of stamps. This box had been opened and no stamps remained in the box. The testimony showed that the company customarily carried approximately $60 in stamps at all times.

William Forbes, a watchman for the building, who also operated the elevator when occasion demanded, testified that about 3:00 P. M. of Decoration day he received a signal to come to the ninth floor. He drove the elevator to that floor, where he saw Edwards, since deceased, a janitor of the building, in company with another man. Edwards said to Forbes, "Hold him, Bill!" After the man entered the elevator Forbes drove the elevator to the basement of the building. On the way down the man said to Forbes, "Come on, now; give me your keys," to which Forbes replied that he did not have any keys with him. After releasing the defendant in the basement Forbes drove the elevator back to the main floor and reported to some policemen there present that the man was in the basement. About thirty minutes later Forbes went to the basement and there observed that one of the basement windows that opened on the lower level of Wacker drive had been broken out and the defendant was gone.

Police officer Ernest Pieske testified that about 3:25 P. M. on Memorial day he went to the lower level of Wacker drive, where he had parked his car; that while he was walking there he heard the crash of glass east of him, and he immediately looked around and saw a man sticking his head out of a basement window of the building hereinbefore named. The officer immediately stepped behind a pillar and watched the man crawl out of the window. As soon as he got out the officer placed him under arrest and searched the man, whom he identified as the defendant. He found in his pockets a fountain-pen flashlight, a piece of a screw-driver, two parts of the broken handle of a screw-driver, two pieces of steel spring, a heavy

hammer or sledge, and a penciled memorandum, hereinafter mentioned. After arresting him the officer placed defendant in the officer's automobile, and while the officer was entering the car from the opposite side defendant opened the right-hand door and jumped out. The officer caught him by his left coat pocket and tore it down to the seam but was not able to hold him. The officer thereupon drew his revolver and started running after the defendant, threatening to shoot, and commanded him to halt, which he did. He was taken to the detective bureau, where he was further searched, and stamps varying in denomination from one cent to fifty cents and of a total value of $51.59 were found in his coat pocket. He was then asked by the officer where he got the stamps, but he refused to answer. When arrested he was fully dressed, wore a sailor straw hat and a light overcoat. The evidence shows that there were pieces of jagged glass remaining in the window frame through which it is alleged he crawled. His trousers were torn along the sides and the tops of his hands were slightly cut.

On May 31 Forbes and Edwards went together to the detective bureau, and Forbes there identified the defendant as the man whom he had seen on the previous day in the building on the ninth floor and had taken to the basement. He testified that the man he saw in the building, and later at the detective bureau, had sandy hair, and that his left eye appeared to be smaller than the right eye. This peculiarity of the defendant's eyes is not denied. Forbes identified the defendant at the detective bureau from a line-up of five other men. Just prior to the line-up the defendant took off his straw hat and exchanged it for a felt hat with one of the prisoners in the line, the other prisoner putting on the defendant's straw hat. This exchange was made before Edwards and Forbes had had an opportunity to see the men in the line-up. At the time of his arrest the defendant gave his address as the Morrison Hotel. He did not live at the Morrison Hotel but at Glenview.

Charles E. Egan, a police lieutenant assigned to the State's attorney's office, testified that on April 4, 1934, he, accompanied by other officers, went to the defendant's home, on Wagner road. Lieut. Egan testified that before going into the home or making his presence known he watched the movements of the occupants of the house and saw the defendant dressed in trousers and a white shirt. When he went to the door Mrs. Reeves came to the door. The officers entered and found the defendant in bed, dressed in his underwear and with his hair smoothly combed. The bedding was smooth and undisturbed. Lieut. Egan notified the defendant to appear in Judge Steffen's court the next morning. The defendant replied he was sick and could not come, and he did not appear next day at Judge Steffen's court. The officer returned to the defendant's home the next day, and on different occasions during the next three weeks, but was unable to find him. A search was made by the police of the city for the defendant, but he was not located.

The defendant testified in his own behalf. He stated that he and his wife left their home on Decoration day, stopped about 1:00 o'clock P. M. at the home of Lloyd Kunkel, the defendant's nephew by marriage, who joined him and drove to the loop in the defendant's Lincoln sedan. The defendant parked his car at the lower level of Wacker drive, at Wabash avenue, about 1:30 or 1:45 o'clock. The three persons watched the parade on Michigan avenue until about 3:30 or 3:45 o'clock. The defendant then left his wife and Kunkel to get his car. He walked to the lower level of Wacker drive by the stairway in front of 330 Michigan avenue, which is on the east side of the avenue. After reaching the drive he walked across towards Wabash avenue. When about the center of 360 North Michigan avenue he heard a crash of glass and saw a man running south on the lower level. Officer Pieske then rushed up and arrested the defendant. The defendant stated that he

told the officer about the man he had seen running; that he and the officer walked around the east side of the building, the direction which this hypothetical man had taken; that the defendant saw the broken glass and noticed a number of objects, amongst which were a screw-driver and sledge hammer, on the sidewalk but did not make an inspection of them. He denied that he had any of the different objects on his person or in his pockets which officer Pieske testified to finding in the clothing of the defendant. He categorically denied that he attempted to escape, that his trouser legs were torn, that there were any cuts or abrasions on his hands or that he had been in the company's offices. He stated that he tore his overcoat pocket when he got out of the car at the detective bureau, and that he wore a straw hat on the day he was arrested and not a felt hat. He denied that he exchanged hats or attempted to exchange hats with any man in the line-up and denied he told the officer that he lived at the Morrison Hotel.

Lloyd Kunkel corroborated the defendant's evidence in so far as riding to the loop, the time of arrival there, the parking of the automobile, the watching of the parade, and the time that the defendant left Kunkel and Mrs. Reeves. The eleven-year-old daughter of the defendant testified that at the time Lieut. Egan was at their home on April 4 her father was not walking around in the room but was sick that day and had been in bed about three weeks. Dr. Maltman testified that on April 4, 1934, the defendant was under his care; that on or about that day he made a medical examination of him at the physician's office and treated him professionally at that time. The doctor did not testify as to any previous professional treatments of the defendant in the year 1934.

The defendant offered in evidence the testimony of four witnesses as to his good reputation as a law-abiding citizen. The testimony of three of these witnesses was excluded. In rebuttal the People offered the testimony of

four police officers who had known the defendant for a number of years and who testified that his reputation was bad as a law-abiding citizen.

The defendant urges that the evidence, taken in its most favorable light for the People, is not sufficient to sustain his conviction of burglary, and that the *corpus delicti* was not proved. The evidence shows no marks of forcible entry on any doors, windows or entrance-ways to the company's offices, yet it cannot be gainsaid that the company's offices had been entered. The combinations broken by force from the safes, the open doors thereof, the metal screwdriver thrust into and remaining in the door mechanism of one of the safes, and the rifled metal stamp-box, gave powerful and convincing testimony that the offices had been entered against the owner's will by some person bent on the commission of a felony. While there is no direct evidence as to the manner in which the offices were entered, it was not necessary to prove the particular manner of entry. Whether entry was made by means of picking the lock of one of the doors with one of the spring wires testified to by the officer as being found on the defendant's person at the time of his arrest, or by a skeleton key, is wholly immaterial. It is self-evident that some force was used to open the locked door of the offices. The breaking and entry may be proved by circumstantial as well as direct evidence. *People* v. *Geisler,* 348 Ill. 510.

Edwin F. Fitch, the office manager of the company, testified that when he entered the offices about 8:30 A. M. on May 31 and discovered the damage to the safes he went into the vault, where he examined the stamp-box and found it empty, and that on May 28 there was approximately $60 in stamps in the stamp-box. He further testified that the stamps produced which the officer had identified as being found on the person of the defendant were similar to the ones carried in the stamp-box. No unbending rule can be laid down as to the amount of evidence

required to prove the *corpus delicti.* Each case must generally rest on the facts and circumstances proved in that particular case. (*People* v. *Sampson,* 337 Ill. 643.) Here the evidence, although denied by the defendant, was that stamps of the approximate kind and amount carried by the company were found on defendant's person at the time he had just escaped from the building. The penciled memorandum showing the combination to one of the safes was found on the defendant's person. Razell, a book-keeper for the company, testified this exhibit was in his handwriting and was kept by him in a drawer of his desk in the office of the company. There was ample competent proof to establish both the burglary and the *corpus delicti.*

Complaint is made that the trial court improperly admitted the testimony of Lieut. Ronan as to what janitor Edwards said and did at the time of the show-up at the detective bureau. Ronan testified that on the occasion of the show-up Edwards stated he recognized one of the prisoners as the man he had seen in the building on Decoration day and pointed out the defendant as the man; that Edwards then walked over and placed his hand on the defendant as being the man he so recognized; that Forbes said that at the time the defendant was in the building he had on a felt hat, and that Edwards insisted that defendant was wearing a straw hat on that occasion. When the assistant State's attorney started to examine Ronan on this branch of his testimony the defendant's attorney objected. Thereupon the jury was withdrawn and out of the presence of the jury Ronan was asked questions eliciting his testimony. The defendant objected to each of the questions. The trial court held such evidence was competent and overruled the objections. The jury was then recalled and substantially the same questions were asked and substantially the same answers given. The defendant did not at that time object to the questions asked in the presence of the jury. It is now urged by the People that the defendant

by not objecting to this line of evidence in the presence of the jury is in no position to insist on the objection made before the trial judge out of the presence of the jury. *Lipsey* v. *People,* 227 Ill. 364, and *People* v. *Fisher,* 295 id. 250, are cited in support of this view. Neither case justifies the People's position. It was error to permit Ronan to testify to the statements made and the things done by Edwards by way of identification of the defendant. (*People* v. *Krejewski,* 332 Ill. 120; *People* v. *Lukoszus,* 242 id. 101.) The error was further amplified by the assistant State's attorney referring to this evidence in his argument to the jury.

The action of the trial court in striking the testimony of three witnesses who testified to the good reputation of the defendant as a law-abiding citizen is urged to have been erroneous. The witness VanArsdall was a clerk at Marshall Field's and had sold the defendant clothing on frequent occasions. This witness testified he had never met the defendant out of the store. The witness Seese was a station passenger agent for the Alton railroad. Some fourteen years previous to the trial he had had some business dealings with the defendant in the sale of radio equipment to him. This witness testified that he did not know the defendant's business since that time. The witness Hesser was in the automobile business. He had rented a business property to the defendant about five years before the trial. Each of these three witnesses further testified upon cross-examination that his testimony concerning the defendant's reputation was his personal opinion of such reputation based upon his business relations with the defendant and that such witness had never discussed the defendant's reputation with anyone. None claimed any acquaintance with the associates or neighbors of the defendant or with the public generally with whom the defendant came in contact. It has been said by this court that the general reputation of a defendant in a criminal case must be confined

to his reputation in the neighborhood in which he resides or among his associates. (*People* v. *Rembowicz*, 335 Ill. 604.) The mere fact that a witness has not heard the reputation of a defendant discussed is not in itself sufficient to destroy the foundation for the admission of the reputation in evidence, because such lack of discussion might well be the highest indication that the reputation was of the best. However, in a metropolitan center such as the city of Chicago it is not to be presumed that witnesses would have heard such a discussion if, in fact, there had been any. A man's reputation is the esteem in which he is held in his neighborhood or amongst his associates or those with whom he comes in contact either in a social or business way. It would be impossible for a witness to know the defendant's reputation unless the witness knew or came in contact with at least some of the defendant's neighbors or associates or persons with whom he might come in contact in the business world. Each of these three witnesses lived in different sections of the city of Chicago, while the defendant lived in a suburb on the north shore and not in the neighborhood of any of the three witnesses. Each of such witnesses based his testimony on his own personal opinion of the defendant through transactions had with him. Reputation evidence on behalf of a defendant must be limited to the witness' knowledge of his reputation, and cannot be admitted to show the existence of favorable traits of character solely from the personal knowledge and observation of his conduct by the witness. (*People* v. *Willy*, 301 Ill. 307; *People* v. *VanGaasbeck*, 189 N. Y. 408, 82 N. E. 718; *People* v. *Albers*, 137 Mich. 678, 100 N. W. 908.) Reputation witnesses must be shown to have adequate knowledge of the subject, but a mere claim of that knowledge is *prima facie* sufficient. If, however, it is developed on cross-examination that a witness does not have the proper foundation for the expression of an opinion, such testi-

mony should not be admitted. The striking of the testimony of these three witnesses was not prejudicial error.

The rulings of the court on the testimony of the witness Forbes as to his identification of the defendant at the detective bureau were not erroneous.

Other rulings of the trial court upon the admission and rejection of evidence are urged to have been erroneous and prejudicial to the defendant. We have carefully reviewed all of such rulings and find no error therein detrimental to his rights.

When Lieut. Egan was about to be called to the stand the assistant State's attorney made the statement "flight," to the trial judge. The defendant objected to this statement in the presence of the jury. The objection was sustained. It is obvious from an examination of the record that the statement was made in good faith by the assistant State's attorney to the trial judge for the purpose of informing the judge upon what subject the witness was expected to testify. The defendant was not prejudiced by the statement.

Complaint is also made of certain statements by the assistant State's attorney in his argument to the jury. It is not necessary to repeat these improper statements here. Objections were promptly sustained by the trial judge to such utterances and the jury instructed to disregard them. The statements should not have been made. However, upon consideration of the whole record we are of the opinion that the judgment should not be reversed for the improper conduct of the State's attorney. *People* v. *Durkin,* 330 Ill. 394; *People* v. *Bond,* 291 id. 74; *People* v. *Buckminster,* 282 id. 177.

Lastly, the defendant complains of that portion of the narrative instruction given on the subject of the presumption of innocence. It is urged that the instruction is subject to attack for the reasons similar instructions were held erroneous in *Flynn* v. *People,* 222 Ill. 303, and *People* v.

*Ambach,* 247 id. 451. The defendant is in no position to urge that the giving of the instruction was erroneous, as an examination of the record fails to disclose any objection made or any exception taken to the giving of the instruction.

This is not the character of case where the jury fixes the penalty, and while there are errors in this record which in a close case would require reversal of the judgment, yet the competent evidence so overwhelmingly and thoroughly proves the defendant's guilt beyond a reasonable doubt that the jury could not conscientiously have arrived at any other verdict. We would not, therefore, be justified in setting aside the judgment of conviction. *People* v. *Durkin, supra; People* v. *Guilfoyle,* 321 Ill. 93; *People* v. *Buckminster, supra.*

The judgment is affirmed. *Judgment affirmed.*